## JUANA QUINONES ET AL.

*v.*

## AMERICAN RAILROAD COMPANY OF PORTO RICO.

### No. 541.

1. If a person injured knew nothing about his actual employer being an independent contractor, he is not chargeable with notice, and may sue the principal.

NOTE.—*Master and servant; independent contractor.*—For exhaustive notes on independent contractors, see Richmond v. Sitterding, 65 L.R.A. 445, and Knicely .v. West Virginia Midland R. Co. 17 L.R.A.(N.S.) 371; as to liability of master to servant for failure to provide independent contractor with safe appliances, see note to Miller v. Moran Bros.' Co. 1 L.R.A.(N.S.) 283.

2. When the ways, works, machinery, or plant belong to the principal, he cannot avoid responsibility by employing an independent contractor.

3. Illegitimate children may sue through their mother as their natural guardian.

4. See a case in which the court apportioned the damages between the minor plaintiffs.

Opinion filed August 7, 1908.

———

*Mr. Frederick L. Hill* and *Mr. Joseph Anderson, Jr.*, attorneys for plaintiffs.

*Mr. Francis H. Dexter,* attorney for defendant company.

RODEY, Judge, delivered the following opinion:

This suit was brought *in forma pauperis* by Juana Quiñones and Petra Quiñones, who are minors, aged fifteen years and six years, respectively, and who sue by their mother and natural guardian, María Perez, to recover damages in the sum of $3,000 for the death of their father, Tomas Quiñones, through the alleged negligence of the defendant railroad company.

The accident through which the death occurred took place on the 29th day of January, 1908, in the defendant's railroad yards near San Juan, Porto Rico. The suit was filed on March 30th, and was tried under stipulation, before the court alone, without the intervention of a jury, in the forepart of April last. The facts in the case, as shown by the evidence, are about as follows:

At the time of the accident, the deceased was working as crankman on a railway crane, or traveling derrick. It is an

Quiñones v. American R. Co.

ordinary railway derrick or crane, built like a flat car, and has a counterweight on its rear arm to balance the load lifted in front. The whole crane apparatus, including the counterweight, works on a swivel set into the top of the car, so that loads can be lifted from one side of the car and swung clear around to the other side and deposited. The road is narrow guage, being only one meter in width, and consequently a car resting on such a track can be tipped over easier than cars of the same weight and elevation on a broader or standard-guage track.

The work being done at the time of the accident was the lifting of a lot of flat-car platforms from one side of the derrick, or crane, over to the opposite side, where they were lowered onto their own trucks, that rested on another track to receive them.

The deceased and another man were working the windlass or cranks on opposite sides of this crane, and were standing on the platform of the derrick car. They had, on the morning in question, grappled, lifted, and swung around, four of these car tops without any accident having occurred. For some reason, as they swung the fifth one around with the derrick, and when they were about to deposit it on top of its trucks, the whole derrick car capsized, and the two men working at the cranks fell under the crane arms on the ground at the side of the track. One of them, by good luck, fell into a depression, and was not injured, while the deceased, having fallen on level ground, was struck by one of the iron arms of the derrick, or crane, and received such injuries as that he died within about thirty minutes.

We personally saw all the witnesses, and heard all the evidence as given orally on the stand, several months ago, and have

just reread the entire transcript from the notes of the stenographer, and we find that none of the many witnesses for plaintiff, except one, could or did give any explanation or reason as to why this crane, or derrick, fell over or capsized with this fifth-car platform, which was of exactly the same size and weight as the other four which had previously been handled without difficulty or accident. This witness was a young fellow, about twenty-four years of age, named Juan Colon y Cosme, who happened to be present at the moment it occurred, having gone there to ask for work. He testified that the accident happened in this way, and he was looking at the derrick at the time (page 25, transcript): "When I was standing there, when they had grappled the platform, they hoisted it. When they hoisted the piece that they shifted to the other side, it appears that the machine was not in condition for operation. Q. Did you say in position or condition? A. In position for working, because, when shifting to the other side, it did not shift, it did not swing; then, when it did not swing, suddenly it tumbled."

Now this would indicate that, after hoisting this load, the crank men, or whosesoever duty it was to swing the derrick around, did not do so at once, or else there was in fact some defect about the derrick, and that, when the same was done, it was done so suddenly as to knock out the propping from the sides of the derrick, if it had any, or perhaps the force was great enough to tip the whole thing over, notwithstanding the feet and propping. Or it may have occurred in this way,— that when the load in question was grappled, the crane arm was not directly over it, and hence the result was more of a pull than a lift, that the load did not at once easily respond to the slanting pull of the crane chains, and that, as the pull increased

IV. PORTO RICO—17.

by the renewed and more forcible turning of the cranks, the load suddenly gave way, and then, being free, as the crane arm was swung around, the load pendulumed too. far in the opposite direction, and thus knocked out the props, if it had any, and capsized the whole car and derrick, resulting in the accident. From a most careful examination of all the evidence in the case, we think this is the way in which the accident actually occurred.

It seems that this little car derrick has screw feet attached to each of the four corners of its platform, consisting of a strong iron rod, or tube, with a flat cross piece of iron at the bottom to rest on the ties or the ground, and that, when the derrick is stopped at any particular place on the track, these four posts or feet can be screwed down from the platform of the derrick car, like the four feet of a table, to keep it from tipping over with heavy loads. It is not certain whether these feet rest on the ground or on the ends of the ties; but it is probable they rest on the ends of the ties, close to the rails, and so add very little to the stability of the car, unless they are chained to the rails, which it seems never had been done. The man in charge of the derrick on the morning in question, one Valentin Mascaro, testified that these posts, or feet, were in fact so lowered or screwed down so as to rest on the ties or the ground at the time of the accident, and that, in addition, he had props or blocks piled up from the ends of the ties to the bottom of the sides of the platform of the derrick car to give it still more stability. He states that these props may have fallen out, or that the rails of the track may have been a little out of level, and that perhaps that caused the tipping over, etc., and, as trying to account for the accident (p. 49, record), he said: "I can't say, because we had lifted the platform. In lowering it we felt some trepida-

tion suddenly. I don't know if it might have been that some of the wedges or props came off, or that they let it go."

Plaintiffs introduced no witness who could testify as to whether these feet of the derrick car were in fact screwed or let down to serve as props at the time in question, or whether the sides of the derrick car were in fact properly blocked or propped, as stated by Mascaro.

Counsel for plaintiffs contends that Mascaro's evidence as to this is not entitled to much credit, as he is an interested witness, and wants to excuse himself and relieve the defendant from liability, and that his evidence was poorly given, and evidently made up for the occasion. However this may be, he is the only witness on the subject, and, in any event, the derrick, on that very morning, safely sustained a similar load four different times, which strengthens our belief that we are right in our belief as to the cause of the accident.

A good deal of evidence was put in to show that if chains had been attached to the cross pieces, or shoes, on the bottom of these four posts, or legs, and tied around the rail under the wheels of the derrick car, that it would have been impossible for it to tip over; an expert mechanical engineer so testified. It is not in evidence, though, that this was ever done at any time, although the derrick has been owned and in use by the railway company for seven or eight years.

The manager of the railway, Mr. Duval, testifies that these car platforms that were being lifted that morning weighed about four and a half metric tons, and that the derrick has a capacity of and is capable of lifting eight or nine metric tons; but he did not say whether it must be chained to the track when carrying its capacity.

When the car tipped over, the counterweight of the derrick broke off and fell to one side; but the inference to be gathered from all the evidence is that the whole derrick apparatus, when it was being used that morning, was generally in good condition.

It further appears that the deceased had been working off and on for the railway company for several years; but whether he had ever worked on this or any other derrick before does not appear.

There is no dispute but what there was sufficient help employed in and about this work and derrick at the time of the accident.

The railway company defends, first, on the ground that the plaintiffs are illegitimate children, and therefore not entitled to recover under the laws of Porto Rico, and second, on the ground that the work at the time was being done by an independent contractor, this Mr. Valentin Mascaro, who employed deceased, and paid him his wages direct. It is probably true that Mascaro at the time had a verbal contract with the defendant, to mount this consignment, which consisted of 100 sugar-cane platform cars, upon their trucks, at so much per car, and was then actually engaged in the work, and did actually himself hire and was to pay the deceased for his work; but it is not certain that deceased knew anything about this arrangement, because the evidence is that Mascaro simply came to deceased the day before, and asked him to come and work for the company. These cars belonged to the defendant, so did the derrick, and the work was done with their tools and implements, in their yards, and on their tracks.

The evidence shows that the domestic relations of the deceased, Tomas Quiñones, were of a character that is said to

Quiñones v. American R. Co.

be quite common in Porto Rico. He had lived all his life, since he was old enough to be married, with this same woman, without ever having had a marriage ceremony performed between himself and her, either before any judicial officer or clergyman. They had several children, one boy, who is twenty-four or twenty-five years of age, was a witness in the case. The parties were competent to marry, as neither of them had ever been married before, and, as far as the evidence shows, neither of them ever had any children by any other person, save by this union. They had held each other out through all the years to all their neighbors as being husband and wife, and, save for the lack of the marriage ceremony, were in the same condition as any other family of like social condition. Under the common-law rule or the statutory rule that applies in many states, this would have constituted them man and wife.

The minor children and the woman depended entirely on the work and labor of the deceased for their scanty support.

We might as well settle the point here, that, under the facts, we think these children had a right to sue as they have done here, by their mother and natural guardian, and we so hold. We can find nothing in the laws of Porto Rico that obliges us to hold the contrary, but everything we can find in the local and civil law tends to oblige the parents of illegitimate children to support and educate them; and therefore we think that, under § 325 of the Revised Statutes of Porto Rico, 1902, which is § 4 of the employers' liability act, it would be too narrow to hold that the word "children," as used therein, does not include illegitimate ones as well as those that are legitimate, especially in a case like this, where neither the man nor the woman have or ever had any other children, so far as the record

shows.    The chapter on illegitimate children (P. R. Rev. Stat.
1902, p. 819), §§ 187 to 191, inclusive, shows that the intent
of the local law is that the parents of such unfortunate children
shall educate and support them.    The provisions of the local
law regarding monthly sums to be paid for the support of ille-
gitimate children have no application here; that applies, we
think, only when the action is against the parent himself; and
we think that § 219 of the Civil Code, providing that the
obligation to support ceases with the death of the person obliged
to give it, also applies only where the claim or judgment is
against the natural father or mother, and not in a case like this,
where there are not even any others or legitimate heirs.    The
case of Slater v. Mexican Nat. R. Co. 194 U. S. 120, 48 L.
ed. 900, 24 Sup. Ct. Rep. 581, cited by defendant's counsel,
has no application here, as this is a suit under local laws here
in Porto Rico, while that was a case where the complainants
sought, in a circuit court of the United States, a decree based
on laws of the Republic of Mexico, for a tort which occurred
there, etc., and the court very properly held it had no juris-
diction.    The local Porto Rican employers' liability act, as
copied from the States, is, as we see it, more particularly
intended to recompense the legal representatives of the deceased,
and gives compensation even to the parents of the deceased
when they were dependent upon him for support.

Another point made by the defendant is that these minors
cannot sue by their mother, even though she may be their
natural guardian.    We find nothing in the law to prevent her
so doing, and, if there was, the mother could be considered as
their next friend in any event, and could, we think, sue in that
capacity in this sort of a case, at least, if in no other, which

Quiñones v. American R. Co.

latter point we are not now passing upon. She is suing here for the children, and the recovery would be for them, not for her.

As to the question of whether or not this man Valentin Mascaro was such an independent contractor of the defendant at the time of the occurrence of the accident as to relieve the defendant from liability, we will hold that he was not; first, because the facts do not warrant such a holding, in our opinion, and second, because § 7 of the employers' liability act, page 154, P. R. Rev. Stat. 1902, provides in substance that such a defendant should not be relieved if the ways, works, machinery, or plant are the property of the main employer, or furnished by him, or if the defect arose, or had not been discovered or remedied, through his negligence or that of those intrusted by him with the duty of seeing that such implements were in proper condition.

The evidence shows that Mascaro had been employed for years by the defendant railway company, that he, at this very time, considered the immediate superintendent of the defendant's railway as his chief, and reported the injury and death to him. As we look at the matter, the work in question was simply a piece of work done by the job in the company's own railway yards, and that it was under their complete supervision. Mascaro got so much for doing the work, hired men and discharged them, and went to the office and got money and paid them off; we do not think this put him in the category of such independent contractors as those that own stone quarries or other such things or sources of supply themselves, and then get the cars of the railway company to use in furnishing the rock, nor is he like a man who contracts to build a house for another,

and brings his own staging, tools, teams, and plant on the ground, with which to do the work, and keeps a set of books for himself. (See the exhaustive notes on this subject in The Joseph B. Thomas Case, 46 L.R.A. p. 58, particularly pages 110 et seq.) Were railway companies permitted to avoid their liability in this flimsy way, they could let the running of the trains by the job in the same manner. We do not think the law contemplated this. See Jensen v. Barbour, 15 Mont. 582, 39 Pac. 906.

The only really meritorious question looking to a defense in this whole cause, as we see it, is this:

It is manifest that the derrick in question, as and of itself, was in good condition at the time of the accident, and the question arises: As the railway is a narrow gauge, and as the derrick car had these shoes, or feet, attached to it as a part of the implement itself, was it the duty of the railway company to see to it that it was properly chained down to the track, to prevent it capsizing whenever any load of any considerable weight was being lifted? Or is the negligence of Mascaro, who had charge of the work, if he was negligent, the mere negligence of a fellow servant, that relieves the defendant? The question also arises, Did the deceased, being one of the men engaged in working that derrick, accept the ordinary risks connected with the use of the machine, and are his heirs, by reason of his contributory negligence, if any, in that regard, barred from recovery here?

It would appear to have become the policy of the United States, nationally speaking, that employers should not be relieved from all the risks attending the dangerous employments of the nation, and hence Congress, on June 11, 1906, passed a national employers' liability act (34 Stat. at L. 232, chap. 3073,

Quiñones v. American R. Co.

U. S. Comp. Stat. Supp. 1907, p. 891), which was afterwards,. although by a divided court, held to be unconstitutional by the Supreme Court of the United States (Employers' Liability Cases [Howard v. Illinois C. R. Co.] 207 U. S. 463, 52 L. ed. 297, 28 Sup. Ct. Rep. 141). The recent Congress re-enacted the law in a modified form, intended to avoid the objections the first one was found to contain, but this new act did not become law in time to cover the case at bar. Although we had previously intimated a contrary view, in Diaz v. Fajardo Development Co. 2 Porto Rico Fed. Rep. 164, still, in obedience to that holding of the Supreme Court, we held, in Colón v. Ponce & G. R. Co. 3 Porto Rico Fed. Rep. 367, and in other cases,. that the national act referred to was unconstitutional and void,. and not in force in Porto Rico. It will be seen by an examination of some of these latter opinions of ours, that we had doubts as to whether or not the Supreme Court of the United States had gone as far as to hold that the national act was void. as to the territories, but we concluded, after an examination of the text of the opinion, that it had done so. We see from the July number of "Law Notes," which is before us, that the court of appeals of the District of Columbia has held, in the case of Hyde v. Southern R. Co. 31 App. D. C. 466, that. the law is constitutional and in force in the District of Columbia and the territories. It seems that they resolved the same doubts that we had the other way, and the matter will no doubt again go before the Supreme Court of the United States. However, we see no reason to change our former ruling, and, until so commanded to the contrary by the Supreme Court of the United States, will abide by our said former decision.

After a full examination of the facts and the law in the

premises (and we confess that we have, under the inducement
of the arguments and brief of the respective counsel, made a
more extensive examination of the subject than we have had
time to set forth in this opinion without making it too lengthy),
we are of the opinion and we find:

That the two plaintiff minor children have a right to sue by
their mother, as they did in and by the complaint.

That Tomas Quiñones was the father of the said two minor
plaintiffs, and they were wholly dependent upon him for their
support.

That Valentin Mascaro was not an independent contractor of
the defendant railway company, but their direct servant.

That the defendant railway company is guilty of negligence
in not having furnished chains to bind down this dangerous
piece of machinery on its narrow-gauge tracks to the railway
rails, and that it is further guilty of negligence in not having
seen to it that Mascaro used the machine properly on the occa-
sion in question in that way, and that, under all the circum-
stances, considering his condition and lack of intelligence, which
was known to the defendant, the deceased Quiñones was not
guilty of such contributory negligence, and did not, in fact or
in law, accept such risk, as should bar recovery here.

That therefore the defendant is liable to the plaintiffs in
this suit; but, as the statute commands us to give judgment in
accordance with the degree of culpability of the employer, and
to consider certain equities between the parties, therefore, after
a full consideration of all the circumstances of the case, such
as the age, earning powers, etc., of deceased, and the ages of
plaintiffs, respectively, and the funeral expenses paid by defend-
ant, we find that the former should recover from the defendant

railway company the sum of $2,000. That, as the suit is *in forma pauperis,* and the recovery belongs to the infants, the court exercises its right to fix the compensation of counsel, which is hereby done at the sum of five hundred dollars ($500), which shall be paid to them, and the balance shall be divided in proportions as follows:

On account of the ages of the said infants, and the time they will yet need to be supported, that is to say, of the said sum, the minor Juana Quiñones shall be entitled to six hundred dollars ($600) and the minor Petra, to nine hundred dollars ($900). Let a judgment be entered accordingly.